IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2018

## STATE OF TENNESSEE v. LONNY LAVAR BARDIN

**Appeal from the Circuit Court for Obion County**
**No. CC-16-CR-150     Jeff Parham, Judge**

_____

### No. W2017-02506-CCA-R3-CD

_____

Lonny Lavar Bardin, Defendant, was convicted following a jury trial of Class B felony rape and Class E felony sexual battery and sentenced to eight years' incarceration. Defendant claims that there was insufficient evidence to support his convictions. After a thorough review of the facts and applicable case law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joshua B. Dougan, Tennessee, for the appellant, Lonny Lavar Bardin.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Tommy A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

Defendant was indicted by the Obion County Grand Jury for one count of rape and one count of sexual battery. The indictment stated that the offenses occurred between June 14, 2016, and August 9, 2016, that the offenses occurred without the consent of the victim, and that Defendant knew or had reason to know that the victim had not consented.

At trial, Christeena Kingston testified that, during the summer of 2016, she and her three daughters were living with Defendant in a duplex in Union City. Defendant was

about thirty-seven years old and was married to another woman. Christeena's[1] father, John Kingston; her stepmother, Jeannie Kingston; and her thirteen-year-old stepsister, A.F.; moved into the other side of the duplex around the middle of June of 2016. The side of the duplex where the A.F. and her parents lived was in poor condition due to damage from a previous fire and a large amount of debris and clutter.

According to A.F., after moving into the duplex, she slept for a couple of weeks in her parents' bedroom. She then slept for a short time in a hallway before moving into her own bedroom. The closet in A.F.'s bedroom shared a wall with the closet of the bedroom on the other side of the duplex where Christeena's three girls slept. A portion of this common wall had been removed for ease of access between the two sides of the duplex, and people going from one side of the duplex to the other usually passed through the closets. Both closets had a door that could be closed but not locked from their respective bedrooms.

The first incident involving A.F. and Defendant occurred on her parents' anniversary, June 25, 2016, when Defendant attempted to kiss A.F. John testified that he saw Defendant "pull away from" A.F. with his lips puckered. John confronted Defendant and "slapped him around a few times." Defendant testified that as he was kissing his three daughters goodnight on their foreheads, his youngest daughter said "what about A.F.," so he tried to kiss her on the forehead but she moved, and he kissed her on the bridge of her nose. A.F. initially told John that Defendant kissed her on the chin. At trial A.F. testified that Defendant "tried to kiss" her but "kind of missed." Defendant said John had been "drinking Todka Vodka, like, a half[-]gallon of it" and attacked him.

At some point, Defendant installed a latch on the closet door in Christeena's daughters' bedroom to stop A.F. from visiting so much. Defendant claimed that A.F. had come to their side of the duplex when she was not supposed to be there and that John had "come over throwing a fit about it." When the door was latched, no one could enter Christeena's side of the duplex through A.F.'s bedroom closet.

A.F. claimed that, after she moved into the new bedroom, Defendant made a habit of coming into her room at night. A.F. testified that, a few days after the incident involving John slapping Defendant around, Defendant kissed her on the lips and grabbed her bottom when she came out of the restroom. She said that, on another occasion, Defendant woke her by calling her name and asked her to come into the closet ("the closet incident"). She was wearing only a bra and underwear, which was her customary

[1] Because several witnesses have the same last name, Kingston, we will refer to them by their first name. We will refer to the minor victim by her initials, A.F., as is the policy of this court. We intend no disrespect.

sleeping attire. According to A.F., once she was in the closet, Defendant pulled down his pants, grabbed A.F.'s hand, and put her hand on his erect penis. She claimed Defendant then pulled down her underwear, got down on his hands and knees, and licked her vagina "several" times. After A.F. pulled up her underwear, Defendant told her that this was their "little secret," kissed her, and grabbed her buttocks. A.F said what happened next was a little blurry because she was "half asleep." She said she went back to bed. After this incident, A.F. said she would no longer go to the closet when Defendant called to her. She also stated that this incident occurred before she started school.

A.F. then testified about incidents where Defendant threw her nieces' stuffed animals at her while she was sleeping. Initially on cross- examination, A.F. testified that Defendant only threw stuffed animals at her one time. When asked if she was sure that it only occurred once, she answered "yes." When allowed to refresh her memory with her statement to the investigator, A.F. said it happened two times. She said after the first incident, the stuffed animals were gone when A.F. awoke, but that Jeannie saw about twenty stuffed animals laying around A.F.'s bed on the morning after the second stuffed animal incident ("the second incident"). A.F. also said her Chihuahua was in her room during the second incident and the dog barked and growled when Defendant came to her bedroom and whispered to her. Jeannie testified that, during the night when the second incident occurred, she heard their Chihuahua, which was sleeping in A.F.'s room, barking. Jeannie stated that the second incident occurred in August after the school year started. After the second incident, John questioned A.F., who initially stated that she did not know how the stuffed animals got there. She later claimed Defendant tossed them at her to get her attention. John questioned Defendant, who denied any involvement. John then inserted a screw in the doorframe of A.F.'s bedroom closet to prevent anyone from coming into A.F.'s bedroom through the closet.

On cross-examination, A.F. admitted that she took several medications due to her ADHD and bipolar conditions. Jeannie also stated that A.F. was autistic. A.F. told the jury about her imaginary friend "Jim." A.F. said "Jim" visited her when bad things happened and whenever Defendant was "doing these things." A.F. initially testified that she told her homeroom teacher "the next day" about what had happened to her during the closet incident. Later, A.F. testified that it was on the morning after the second stuffed animal incident that she told her homeroom teacher what had occurred. A.F. said she told her teacher shortly after the school year had started. Her teacher contacted the police, and Investigator Susan Andrews came to school to interview A.F. that afternoon. Defendant was arrested later that day. On redirect examination, A.F. said the first person she told about the closet incident was Susan Andrews.

Defendant testified at trial and denied that he sexually assaulted or raped A.F. Defendant claimed that, on the night before the second incident, he was sitting in the

duplex with John and a friend, Charles Tanser. He said Christeena should have been, but was not, home from work by 11:30 p.m. He claimed that Christeena had previously cheated on him and that he told John, "You know, I'm sorry, but if I catch her cheating again, after she's done let me think that three kids were mine and only one of them was, . . . [y]'all are going to have to go." Defendant said that, when Christeena finally got home around 2 a.m., he went to her car to get a cigarette and found an identification card for Matt Growski, a coworker of Christeena. Christeena claimed that she "just gave Matt a ride home." Defendant claimed that he was arrested the "very next day" and that Matt moved into the duplex with Christeena that same day. He claimed that Christeena moved in with Matt a few days later and that she currently lived with Matt in his trailer. Defendant claimed that John had three dogs, a Chihuahua and two Pit Bulls. He claimed the Chihuahua and one of the Pit Bulls, which was kept in a cage, slept in A.F.'s bedroom. He said the dog would growl and bite at the cage whenever he came around.

Defendant called Investigator Susan Andrews as a witness. Investigator Andrews agreed that A.F. told her that "she had been made to go into the closet wearing her pink bra and her Batman underwear" and that Defendant molested her. Concerning when the "sexual contact" occurred, Investigator Andrews read the following from her report:

> Sexual contact happened on the second night she was at the residence of 808 North Ury Street. [A.F.] advised [she] move[d] to Union City about two weeks after school ended, which was on the 31st of May, 2016.

Investigator Andrews agreed that "[A.F.] told you on August 11th that the closet [incident] happened [on] the second night she was [at the residence]." On cross examination by the State, Investigator Andrews said that she went to the residence on August 17th and that she saw "a screw hole" in the door frame.

At the conclusion of the proof, the State elected to proceed with the act of cunnilingus for the charge of rape and with the act where Defendant "took [A.F.'s] hand and placed it upon his exposed penis" for the charge of sexual battery. The jury convicted Defendant of both offenses. After the denial of Defendant's motion for new trial, Defendant now timely appeals.

**Analysis**

In this appeal, Defendant contends that the evidence presented at trial was insufficient to sustain his convictions for rape and sexual battery. As to the rape conviction, Defendant specifically claims there was no evidence of penetration. The State argues that there was sufficient evidence to sustain the convictions and that

penetration is not required for the act of cunnilingus to constitute rape. We agree with the State**.**

## Standard of Review

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id*. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). "A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).

## Rape

As relevant to this case, "[r]ape is unlawful sexual penetration of a victim by the defendant" where "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]" Tenn. Code Ann. § 39-13-503(a)(2) (2016). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the alleged victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2016). "Cunnilingus" means a sex act accomplished by "placing the mouth or tongue on or in the vagina of another." *See State v. Hoyt*, 928 S.W.2d 935, 942 (Tenn. Crim. App. 1995) (internal quotation marks omitted), *overruled on other grounds by Spicer v. State*, 12 S.W.3d 438 (Tenn. 2000). Penetration of the vagina by the mouth or tongue is not required for a sexual act to constitute cunnilingus. *See State v. Karl E. Vanderbilt*, No.

70, 1992 WL 69650, at *3 (Tenn. Crim. App. Apr. 8, 1992), *perm. app. denied* (Tenn. July 6, 1992), *overruled on other grounds by Spicer v. State*, 12 S.W.3d 438 (Tenn. 2000); *see also State v. John Ray Thompson*, No. M2003-00487-CCA-R3-CD, 2004 WL 2964704, at *13 (Tenn. Crim. App. Dec. 20, 2004), *no perm. app. filed*.

In challenging the sufficiency of the evidence for the rape conviction, Defendant points to the victim's testimony denying penetration. However, as previously stated, penetration is not required for cunnilingus to constitute rape. Because the statutory definition of "sexual penetration" includes cunnilingus, a defendant can be guilty of rape whether or not the defendant penetrates the victim's vagina during cunnilingus. *State v. Michael Warren Evans*, No. 02C01-9306-CC-00124, 1994 WL 59452, at *3 (Tenn. Crim. App. Mar. 1, 1994), *perm. app. denied* (Tenn. Aug. 1, 1994); *see also* Tenn. Code Ann. § 39-13-501(7) (2016).

A.F. testified that Defendant pulled down her underwear, got down on his hands and knees, and licked her vagina "several" times. Defendant denied doing so. Because this is a case of incompatible accounts, the jury had to make a credibility assessment between Defendant and A.F. Based on the verdict, the jury determined A.F. was a more credible witness than Defendant, and this court "does not reweigh or reevaluate the evidence." *Bland*, 958 S.W.2d at 659. A.F. testified that Defendant called her to the closet, pulled her underwear down, and "licked" her vagina. This testimony was sufficient to establish that the Defendant performed cunnilingus on the thirteen-year-old victim. Further, the jury could have inferred that the rape occurred without A.F.'s consent and that Defendant knew or had reason to know that the victim did not consent because Defendant pulled A.F.'s underwear down. Considering the record in the light most favorable to the State, we conclude that the evidence was sufficient to establish that Defendant committed rape when he performed cunnilingus on A.F.

Sexual Battery

As relevant to this case, sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent[.]" Tenn. Code Ann. § 39-13-505(a)(2) (2016). "'Sexual Contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2016).

A.F. testified that Defendant pulled down his pants, grabbed her hand, and put her hand on his erect penis. Defendant denied doing so. Again, because this is a case of incompatible accounts, the jury had to make a credibility assessment between Defendant

and A.F. The jury believed A.F. and not Defendant. Considering the record in the light most favorable to the State, we conclude that the evidence was sufficient to establish that Defendant caused the intentional touching of his intimate part by A.F. by putting A.F.'s hand on his penis. Further, we conclude that the evidence was sufficient to establish that the intentional touching of Defendant's intimate part was accomplished without A.F.'s consent and Defendant knew or had reason to know that A.F. did not consent because Defendant pulled down his pants and grabbed A.F.'s hand to initiate the sexual contact. Lastly, the evidence is sufficient to establish that the intentional touching of Defendant's intimate part "c[ould] be reasonable construed as being for the purpose of sexual arousal or gratification" because Defendant's penis was erect during the offense. Tenn. Code Ann. § 39-13-501(6) (2016); *see also State v. Howard*, 504 S.W.3d 260, 274 (Tenn. 2016).

## Conclusion

Based on the foregoing analysis, we affirm the judgments of the trial court.


_____
ROBERT L. HOLLOWAY, JR., JUDGE